IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>GREGORIO EFRAIN GOMEZ,<br><br>                Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:17-CR-420-RJS |

      Defendant Gregorio Efrain Gomez, who has been indicted for robbing a bank, moves the court to suppress evidence found during a warrantless search of his car on May 20, 2017, in Wellington, Utah. During the traffic stop (and before the officers obtained evidence of bank robbery), he was arrested for falsely identifying himself to the police officer who pulled him over. Following the arrest and a conversation between Mr. Gomez and the officer, the officers searched the entire car. According to Mr. Gomez, the officers had no right to conduct that search.

      In response, the Government asserts the search was valid because Mr. Gomez gave consent to search the car, and, alternatively, the officer legally obtained the evidence during a search incident to arrest. Mr. Gomez argues his consent was not voluntary because the officer coerced it, the officer could not reasonably have believed evidence of the crime of arrest—giving a false name to a police officer—would be found in the car, and the scope of the search exceeded any consent that was ostensibly given.

Based on the totality of the circumstances, the court finds that Mr. Gomez voluntarily consented to a search of the entire car.[1] Accordingly, the motion to suppress is denied.

## FACTS

On the afternoon of May 20, 2017, Officer Andrew Olson of the Price City Police Department was on routine patrol in his car. While in the parking lot of Wal-Mart, he noticed two men (the Defendants) in a Mitsubishi car with Colorado license plates. Their behavior, in his opinion, was suspicious. Defendant Gregorio Efrain Gomez was the driver and his co-defendant Nicholas Mobley was the passenger. Officer Olson, who suspected illegal drug trafficking, followed the car out of the parking lot.

He drove alongside the Mitsubishi for a time, and neither man looked his way. That increased his suspicion: "I looked at them as I matched our windows together, and they – we have what's called locked at the wheel, where the driver appeared – they appeared as statues to me. They didn't look at me, stayed looking forward, which was another indicator to me . . . [o]f suspicious activity." (Tr. of Dec. 12, 2017 Evidentiary Hr'g at 16, ECF No. 35.)

He followed them for about seven miles into Wellington, Utah, the town next to Price City. When the car slowed down to turn into a gas station, the driver braked and the third brake light did not light up. In Utah, it is illegal to drive with a broken brake light. Officer Olson saw his chance to pull the men over, so he turned his emergency lights on.[2] That activated the dashboard camera, which recorded the encounter Officer Olson had with Mr. Gomez and Mr.

---

[1]Because the court finds that Mr. Gomez voluntarily consented to a search of the entire car, the court will not reach the issue of whether the search was justified by the rule allowing a search incident to arrest.

[2]Mr. Gomez does not challenge the validity of the stop.

Mobley.[3]

The car came to a stop, and Officer Olson, who was wearing a body camera,[4] walked up to the driver's side of the car. He explained why he had pulled them over. He then asked Mr. Gomez for his driver's license. Officer Olson also asked what brought them to Utah and received what he believed to be an evasive answer. He asked Mr. Mobley for identification, but Mr. Mobley responded that he had none. (Later in the stop he produced a valid identification card from the State of Colorado.)

Mr. Gomez looked through his backpack but did not produce a driver's license or any other proof of identity. Officer Olson asked him for his name. Mr. Gomez lied and said his name was Bryant Anthony Reyez and that he was born on September 9, 1992.

When Officer Olson asked Mr. Mobley for his name, Mr. Mobley declined to provide his name. At that point, Officer Olson said he needed to identify the two men and if they could not provide evidence of their identities, he would have to take them to the jail and fingerprint them. Mr. Mobley then gave his name and date of birth.

Officer Olson asked for registration and proof of insurance. Mr. Gomez searched through papers in the car and although he eventually produced an insurance card and the registration, both were expired. In the meantime, Officer Olson saw Mr. Mobley unhook his seat belt. Concerned that Mr. Mobley was attempting to run away, Officer Olson ordered Mr. Mobley to put the seat belt back on. Although Mr. Mobley complied, Officer Olson called for backup.

In an attempt to confirm the driver's and passenger's identities, Officer Olson gave Mr.

---

[3] See Olson Dash Camera Video, Def. Ex. 1002 [hereinafter "Dash-Cam Video"].

[4] See Olson Body Camera Video, Def. Ex. 1003 [hereinafter "Body-Cam Video"].

Mobley's name and Mr. Gomez's alias to his dispatch operators.  Dispatch could not confirm Mr. Gomez's identity based on the false information he provided.  Officer Olson continued to press Mr. Gomez for other information that would confirm his identity, such as information on his phone or a social security number, but Mr. Gomez only provided an address.

Soon after that, other officers arrived.  Two officers positioned themselves by the car, one behind the car and the other next to the passenger-side door.  Both were holding their guns just above their holsters, but not in a way that Mr. Gomez and Mr. Mobley could see.  Mr. Gomez and Mr. Mobley were calm and cooperative and did not appear to pose an immediate threat.  After a few minutes, the backup officers put their guns back in their holsters.  At that point, four patrol cars were parked behind the Mitsubishi.

About ten minutes after stopping the car, and unable to confirm Mr. Gomez's identity, Officer Olson told Mr. Gomez to get out of the car.[5]  While Officer Olson conducted a *Terry* frisk looking for weapons, Mr. Gomez said something to the effect of "Can I be honest with you sir?"  (Body-Cam Video at 11:20.)  He then confessed that he lied about his identity and that his real name was Gregory Gomez.  Officer Olson handcuffed Mr. Gomez and said he was being detained for falsely identifying himself to a police officer.

Taking Mr. Gomez to the hood of the patrol car (where Mr. Gomez could see all of the police cars and officers), Officer Olson searched him and asked him again whether they had anything illegal in the car.  During a rapid colloquy, Officer Olson obtained what he believed to be consent to search the entire car.  That discussion can be heard on the video recording taken

---

[5] At that point, Mr. Mobley was taken into custody by other officers.

from Officer Olson's body-cam:[6]

    Officer Olson:    Anything illegal in the vehicle?

    Mr. Gomez:    No.

    Officer Olson:    Is it okay if I take a look?

    Mr. Gomez:    There's nothing in there.

    Officer Olson:    *Well, I'm going to take a look, where, I can take a look where you were seated 'cause that's search incident to arrest, so I'm asking for your permission man, because cooperation goes a long way with me.* Okay?

    Mr. Gomez:    Okay, sir.

    Officer Olson:    *So it's up to you.*

    Mr. Gomez:    I, I have nothing illegal. *You can check.*

    Officer Olson:    Is that okay if I look in your car?

    Mr. Gomez:    It's just . . . . The only thing I have is my own, my, my, my check that I cashed and just money, my I.D. Uh, *I think my I.D. should be somewhere in there*, but . . . .

    Officer Olson:    Okay, so do you have anything illegal in the vehicle?

    Mr. Gomez:    No, no, no, no.

    Officer Olson:    *Is it okay if I take a look*?

    Mr. Gomez:    *Yes sir. You can look.* All I have . . .

    Officer Olson:    Alright, so I'm going to put you in my car . . . .

---

[6]The parties did not provide a formal transcript of the discussion between Officer Olson and Mr. Gomez, although they do quote portions of the conversation in their briefs. The court has attempted to transcribe the conversation about consent as accurately and completely as possible, with the caveat that the recording's sound quality was less than ideal, the parties spoke quickly, and they often interrupted each other.

(*Id.* at 13:24 to 13:53 (emphasis added).)

Mr. Gomez sat in the backseat of the patrol car. A few minutes later, a dispatch operator reported Mr. Gomez's full name, date of birth, and the status of his driver's license.

Officer Olson and two other officers began to search the car. Officer Olson opened the driver's side door and looked in the side pocket of the door. He immediately found Mr. Gomez's State of Colorado identification card. Dispatch confirmed that the information on the I.D. card matched the information that Mr. Gomez provided after he confessed and that dispatch had reported earlier in the stop. Alongside the identification card was about $3,000 in cash, in denominations of $20, $50, and $100. Officer Olson testified that when he found the cash, he suspected drug trafficking because "[u]sually in drug interdiction, in cases that I've been involved with, that amount of cash is – in those high denominations are used for payment of large loads." (Tr. at 36.)

Believing that the car contained illegal drugs or other evidence of drug trafficking, he called for a drug-sniffing dog (but one was not available). The officers continued the search, looking through the car's interior, containers and bags, the trunk, and under the front hood. They also dismantled parts of the car. The search and stop lasted for more than one hour. (Tr. at 46; Body-Cam Video at 15:00 to 1:23:00.)

The officers did not find drugs or a weapon, but they found evidence of a bank robbery committed earlier that day, including more cash and a note demanding money from the bank teller.

## **ANALYSIS**

A warrantless search is per se unreasonable under the Fourth Amendment unless it falls

within one of the limited number of exceptions to the rule. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The Government relies on two of those exceptions to justify the officers' search. The first is a search based on consent. *Id.* The second exception, which specifically applies to vehicle searches, is "a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009).

Mr. Gomez asserts the search was illegal because Officer Olson did not have valid consent to search the car, had no reasonable basis to believe that evidence of the crime for which Mr. Gomez was initially arrested would be found in the car, and that, even if he did, the search far exceeded the scope of his authority under the search-incident-to-arrest exception.

Because the court finds that Mr. Gomez voluntarily consented to a search of the entire car, the court need not address the Government's alternative theory that the search-incident-to-arrest exception also justified the search. But Officer Olson's objective belief that he had authority to conduct the search incident to arrest is relevant to the consent issue. Accordingly, the court discusses it for that limited purpose.

**<u>Voluntary Consent</u>**

To justify a search based on consent, the Government must establish the consent was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968), *quoted in Schneckloth*, 412 U.S. at 222. There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." *Id.* at 224 (internal quotation marks and citation omitted). Rather, "the question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to

7

be determined from the totality of the circumstances." *Id.* at 227.

According to the Tenth Circuit, the government must prove two things to establish voluntary consent. First, the government must provide clear and positive testimony that consent was unequivocal, specific, and freely and intelligently given. Second, it must show the consent was given without implied or express duress or coercion. *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996). Here the Government has satisfied both elements of its burden.

First, Mr. Gomez's own words, recorded on the video from Officer Olson's body-cam, are evidence that he clearly consented to the search. Initially, Officer Olson asked whether he could take a look in the vehicle. Mr. Gomez responded, "There's nothing in there." (Body-Cam Video at 13:28.) Officer Olson asked again, but qualified his request by saying, "I'm going to take a look, where, I can take a look where you were seated 'cause that's search incident to arrest, so I'm asking for your permission man, because cooperation goes a long way with me. Okay?" (*Id.* at 13:45–13:53.)[7]

After asserting the right to search, Officer Olson again asked for permission, noting that the decision was Mr. Gomez's to make. This time Mr. Gomez clearly gave consent: "I have nothing illegal. You can check." (*Id.* at 13:37–39.) Despite that unequivocal statement, Officer Olson again asked, "Is that okay if I look in your car?" (*Id.* at 13:40–41.) Mr. Gomez responded that he thought his I.D. would be found somewhere in the car and he again denied he had anything illegal in the car. But when Officer Olson asked, "Is it okay if I take a look?," Mr.

---

[7]Mr. Gomez argues that this statement was inherently coercive and resulted in nothing more than acquiescence to Officer Olson's stated authority to search. As noted below, the court disagrees.

Gomez said "Yes sir. You can look." (*Id.* at 13:48–52.)  His unqualified language is evidence of clear, unequivocal consent.  This satisfies the first step in the Tenth Circuit's two-part test.

The Government has also met its burden on the second step.  When determining whether consent was given without implied or express duress or coercion, courts consider factors such as whether the defendant was physically mistreated, threatened with violence, given promises or inducements, or was subject to deception or trickery.  *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999).  To support his claim of coerced consent, Mr. Gomez points to the following factors:

> Mr. Gomez had been arrested, handcuffed, and searched against the hood of a patrol car.  Officer Olson claimed lawful authority to conduct the search without Mr. Gomez's consent.  The officer bolstered his demand by making an implicit promise of leniency. . . . Three additional officers were "in the vicinity."  Further, the officer had followed Mr. Gomez from Price City.  During the extended and harassing pursuit, the officer matched the speed of Mr. Gomez's vehicle, drove "door to door," and constantly looked at Mr. Gomez attempting to make eye contact.

(Gomez Reply in Supp. Mot. Suppress at 9 (internal citations omitted), ECF No. 49.)  In the totality of the circumstances presented at the time, these circumstances are not sufficient to establish coercion or duress.

The court first notes that Mr. Gomez's behavior supports the court's conclusion that he was not unduly pressured or coerced to consent to the search.  He had a calm demeanor, was polite and cooperative, and appeared composed.  He clearly understood Officer Olson's statements, and he spoke coherently in response.

The court also finds that none of the circumstances that would otherwise indicate coercion are present.

9

Mr. Gomez was not physically mistreated or threatened with violence. Officer Olson was calm, polite, did not raise his voice, and did not physically mistreat Mr. Gomez. The fact that Mr. Gomez was arrested, handcuffed, and searched before giving consent does not establish coercion. *Dozal*, 173 F.3d at 796 ("Supreme Court and Tenth Circuit precedent establishes that '[c]onsent may be voluntary even though the consenting party is being detained at the time consent is given.'").

The presence of other officers and patrol cars did not create a coercive atmosphere. The officers were not involved in Officer Olson's discussion with Mr. Gomez about searching the car. They were standing some distance away from Mr. Gomez and Officer Olson and for the most part were involved with Mr. Mobley or having their own conversation. They did not display guns or point a gun at Mr. Gomez during the stop.[8] *Cf. United States v. Kimoana*, 383 F.3d 1215, 1226 (10th Cir. 2004) (following case law finding consent to be voluntary even "where the officers approached the defendant with guns drawn, but then holstered them once the area was secured and before asking for consent to search").

The consent conversation took place in public view on a sunny afternoon along a public thoroughfare. *See, e.g, United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993) (upholding voluntariness finding in part because officer asked for consent to search "on the shoulder of an interstate highway, in public view.").

Finally, Officer Olson's statement about his authority to search incident to arrest and his

---

[8]The officers who discretely and temporarily lifted guns from their holsters at the beginning of the stop did not display their guns. They were standing behind the car while Mr. Gomez and Mr. Mobley were sitting in the car and then placed their guns back in their holsters minutes before Mr. Gomez got out of the car.

request for cooperation were neither deceptive nor a trick to obtain consent. His comment that "cooperation goes a long way with me," was too general to suggest a promise or inducement to do something in exchange for consent. And he did not rest on his assertion of authority to search, as is evidenced by his repeated requests for permission to search the car. But most importantly, despite Mr. Gomez's argument to the contrary, Officer Olson's statement that he had the right to search incident to arrest did not undermine Mr. Gomez's clear words of consent.

Mr. Gomez points out that he affirmatively said "yes" only after Officer Olson asserted authority to search, and so he merely acquiesced "after the officer announced, in effect, that he had no right to resist the search." (Reply at 8.) In essence, he contends, Officer Olson's assertion of authority vitiated any purported consent he may have given, and, consequently, the government has shown "no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

In *Bumper*, the Supreme Court found that an officer's incorrect assertion that he had a valid warrant to search a woman's house was "instinct with coercion." *Id.* at 550. "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search." *Id.* "Where there is coercion there cannot be consent." *Id.* Although the Supreme Court referred to the situation as "colorably lawful coercion," *id.*, the situation there nevertheless foreclosed a finding of voluntary consent.

The situation here is distinguishable. Officer Olson correctly claimed he had authority to search incident to arrest.

He had an objective reason to believe evidence of Mr. Gomez's true identity would be found in the car. He had not recovered any identification card or driver's license from Mr.

11

Gomez. And during the *Terry* frisk Mr. Gomez admitted he had a driver's license (albeit revoked). It was reasonable to believe not only that some form of identification would be found in the car in which Mr. Gomez was traveling but also that the identification would be necessary to independently verify Mr. Gomez's true identity. That is sufficient under *Gant*, where the Supreme Court allowed an officer to search for "relevant evidence" of the crime of arrest. *See Arizona v. Gant,* 556 U.S. at 343.

Mr. Gomez contends that Officer Olson did not have a genuine belief that he would find evidence of the crime of arrest. Instead, he says, "the search was not motivated by a genuine concern to prevent destruction of identification cards" but rather by a desire to locate drugs. (Reply at 6.) The court agrees that Officer Olson intended to look for drugs, but his actual intent or reason for the search is not relevant. "[A] stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." *Florida v. Jardines*, 569 U.S. 1, 10 (2013) (emphasis in original).

Based on the reasons set forth above, the court finds the Government has satisfied its burden to prove that Mr. Gomez's consent was not coerced and that, given the totality of the circumstances, Mr. Gomez voluntarily consented to the search.

**Scope of the Consent**

The court also finds Mr. Gomez's unequivocal words of consent included consent to search the entire car. *See United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990) ("[T]he scope of a consent search is limited by the breadth of the consent given."). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange

between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Here, a reasonable person would understand the discussion to extend to the entire car. Throughout their conversation, Officer Olson repeatedly phrased his questions as requests to search "the vehicle" or "the car." *See id.* ("The scope of a search is generally defined by its expressed object."). And despite Mr. Gomez's right to do so,[9] he did not contradict or otherwise limit the object being discussed, or, consequently, the search. His consent necessarily included the entire car, including its contents. "Absent an explicit limitation, . . . , 'a general consent to search [a car] includes closed containers within the vehicle, and this court has specifically ruled that a failure to object to the continuation of a search indicates that the search was conducted within the scope of the consent given.'" *United States v. Mendoza*, 817 F.3d 695, 701 (10th Cir. 2016) (quoting *United States v. Santurio*, 29 F.3d 550, 553 (10th Cir. 1994)) (alteration in original). Indeed, the Supreme Court in *Jimeno* justified a broad search of a car following similar general consent from the defendant:

> In this case, the terms of the search's authorization were simple. Respondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search. Trujillo had informed respondent that he believed respondent was carrying narcotics, and that he would be looking for narcotics in the car. We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. "Contraband goods rarely are strewn across the trunk or floor of a car." [*United States v. Ross*, 456 U.S. 798, 820 (1982).] The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

---

[9]*See United States v. Mendoza*, 817 F.3d 695, 701 (10th Cir. 2016) (noting that defendant may specify, or "delimit," the scope of the search).

500 U.S. at 251.

Here, although Officer Olson did not tell Mr. Gomez he was looking for evidence of drugs (unlike in *Jimeno*), the conversation focused on "anything illegal in the car." Given Officer Olson's consistent and repeated use of that phrase, a reasonable person would understand that the search would not be limited to identification cards. As such, Mr. Gomez consented to a search of the entire car.

## **CONCLUSION**

Viewing the statements and demeanor of Mr. Gomez in the context of Officer Olson's questioning and the surrounding circumstances, the court finds under the totality of the circumstances that Mr. Gomez freely and voluntarily agreed to a search of the entire car.

## **ORDER**

For the reasons set forth above, Defendant Gregorio Gomez's Motion to Suppress (ECF No. 29) is DENIED.

DATED this 7th day of June, 2018.

BY THE COURT:

Robert J. Shelby
U.S. District Court Judge